**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA,      )
        )
      Plaintiff,      )
        )
v.        )
        )      Criminal No. 22-cr-10355-NMG
PANKAJ MERCHIA,      )
        )
      Defendant.      )

**DEFENDANT'S SENTENCING MEMORANDUM**

Pankaj Merchia is a medical doctor who has dedicated his entire adult life to the practice of medicine, helping patients who suffered from the same debilitating condition that he does: sleep apnea. This case arises from aberrational conduct that does not reflect the law-abiding life that Dr. Merchia has led. Dr. Merchia deeply regrets the conduct from which this case arises. He also understands that the consequences of the jury's verdict—a likely sentence of imprisonment, a likely suspension (or even loss) of his medical license, and a permanent stain on his professional reputation—will impact his children even more than they will impact him.

As explained below, the advisory Sentencing Guidelines range reflected in the Pre-Sentence Report (57-71 months' imprisonment) substantially overstates the seriousness of the offense and is greater than necessary to serve the purposes of criminal punishment. With the greatest respect for the law and the Court, Dr. Merchia respectfully requests this Court provide mercy and impose a sentence that credits him for the good he has done as a healthcare provider and a father. We also respectfully submit that any sentence imposed on Dr. Merchia should reflect the fact that, because of Dr. Merchia's sleep apnea, which requires consistent use of a CPAP or BiPAP machine, any prison sentence will be harsher than it would be for a similarly-situated offender without any medical conditions. We respectfully request that the Court consider a non-

1

incarceratory sentence, and we respectfully submit that any incarceratory sentence be no greater than 22 months' imprisonment, which would be a ~60% discount from the bottom of the advisory Guidelines range.

**ANALYSIS OF THE RELEVANT SENTENCING FACTORS**

Criminal sentencing is an inherently individualized process. Section 3553(a) directs a district court to impose a sentence that is sufficient but not greater than necessary to serve the purposes of punishment. We discuss the relevant sentencing factors below.

**I.      Dr. Merchia's Personal History and Characteristics**

Dr. Merchia was born in India. His parents—who are now in their late 80s—were hardworking, modest, law-abiding people. They were not rich, but they showed Dr. Merchia love and support and instilled in him a love of learning and a respect for hard work. From this foundation, Dr. Merchia did not merely excel in school but excelled at a prodigious pace, graduating from Johns Hopkins University at age 18. At Hopkins, Dr. Merchia demonstrated a sincere passion for helping others—he served as a Big Brother to underprivileged kids in Baltimore, and as a tutor to fellow students.

During his freshman year at Hopkins, Dr. Merchia suffered a serious leg injury that left him in the hospital for a week and bedridden at home for six weeks after that. Dr. Merchia's doctors and nurses not only provided him physical care, but emotional and psychological support as well. This reaffirmed Dr. Merchia's desire to be a physician, and he enrolled in Harvard Medical School at age 18. His desire to become a physician was borne not from a desire for wealth or adoration, but from a desire to help others in need. During medical school, he volunteered at Pine Street Inn and engaged in other community service activities.

Dr. Merchia's prodigious academic trajectory earned the awe of his college and medical school professors, but it came at a price to his emotional and psychosocial development. Surrounded by Harvard Medical School students who were significantly older, more mature, and more experienced than he was, Dr. Merchia struggled to make and maintain close friendships and strong social bonds.

Dr. Merchia's only romantic relationship has been his relationship with Dr. Shona Pendse, whom he met in medical school. They eventually had a religious marriage ceremony, lived together as husband and wife, and had three children together (the youngest of whom is 10 years old). Even setting aside the fact that they did not legally marry, their relationship was not a typical marital relationship.[1] Dr. Pendse's parents strongly disapproved of Dr. Merchia for ethnic reasons. Their relationship went through extraordinarily rocky stretches, which put Dr. Merchia's relationships with his young children in jeopardy as well. Largely for the sake of their children, Dr. Merchia and Dr. Pendse tried their best to remain a family. Although he did not always live under the same roof as his children, Dr. Merchia provided his children the same love and support that his parents had provided him. They have grown into exceptional young adults, a reflection of the strong values that Dr. Merchia taught them.

Dr. Merchia's values are reflected not only in the children that he raised with Dr. Pendse, but also in the medical care that he provided to his patients. During his decades of medical practice, Dr. Merchia provided valuable medical care to thousands of patients. He treated all of his patients with dignity and respect, because he knew from personal experience the serious medical conditions from which they were suffering. Like his patients, Dr. Merchia also suffers from sleep apnea, a

---

[1] Out of respect for Dr. Pendse and their children, this memorandum will not go into their relationship in any detail.

debilitating condition that had nearly derailed his academic career and puts Dr. Merchia at a constant increased risk of fatal cardiovascular and cardiac events.

## II.    The Nature and Circumstances of the Offenses

Having presided over the trial, the Court is familiar with the nature and circumstances of the offenses of conviction.  We therefore will not belabor a description of the facts that the jury found proven.  For purposes of sentencing, we respectfully submit that the most important facts are the following.[2]

First, although Dr. Merchia submitted to insurance companies hundreds of CMS 1500 claims forms that the government at trial characterized as false or fraudulent—which leads to an astronomical Sentencing Guidelines "intended loss" figure if the "billed amounts" on the claim forms were mechanically aggregated—even the government agrees that this is not a useful way to gauge the severity of the healthcare fraud offense and money laundering offenses. This is because it is implausible that insurance companies—which receive and process reimbursement claims using software programs that typically prevent any aberrational payments to a provider—ever would have paid anything but a very tiny fraction of the CMS 1500 forms that Dr. Merchia submitted.  And, in fact, the government agrees that the insurance companies only paid Dr. Merchia $742,405.95 on the claims at issue, which were made over a period of years.  Dr. Merchia of course knew that too, and so we do not think that the aggregated "billed amounts" even reflect the "intended loss," let alone that they are a fair proxy for the seriousness of the offense.

Second, the $742,405.96 that Dr. Merchia received is predominantly comprised of a single ~$450,000 payment that Harvard Pilgrim mistakenly made to Dr. Merchia because of an

---

[2] Undersigned counsel understands that Dr. Merchia's courtroom decorum during trial sometimes fell below the Court's expectations.  Dr. Merchia's courtroom decorum is not part of the nature and circumstances of the offense and thus should not be considered an aggravating factor for purposes of sentencing.

unforeseeable bug in its payment software system, not because it relied on the representations on the claim forms. Although it is fair to say that Harvard Pilgrim would not have made that payment had Dr. Merchia not submitted any of the CMS 1500 claim forms at issue, it is also fair to say that Dr. Merchia neither expected nor intended to be paid ~$450,000 on those CMS 1500 submissions. Instead, Dr. Merchia was seeking to be paid ~$20,000. Thus, the *actual* loss figures arguably substantially overstate even the *intended* loss amount.

Third, Dr. Merchia indisputably had provided medical care and durable medical equipment to the patients at issue (only one of whom was a family member) and contemporaneously had submitted CMS 1500 forms to the insurance companies. The insurance companies, however, failed to pay the claims. Where Dr. Merchia misstepped was to seek to "collect" the unpaid claims years later by submitting new CMS 1500 claim forms, rather than sending collection letters or suing the insurance companies when they first became delinquent on their payments. That distinguishes Dr. Merchia's conduct from a prototypical billing fraud, where a physician seeks payments for medical care that was never provided at all (*i.e.*, "ghost services") or for care that clearly was not medically necessary.

Fourth, with respect to the tax evasion counts, the tax evasion scheme that the government charged began with Dr. Merchia doing something that a typical tax evader does not do: he made a very large tax payment—specifically, a ~$2.2 million capital gains tax payment—that he otherwise would not have incurred but for the Sleepheart sale transaction. Thus, although we do not necessarily quibble with the tax loss that Probation has calculated, this is not a case where Dr. Merchia simply evaded a $931,000 tax bill that was then due. That sets the tax offenses apart from a typical tax evasion case.

Fifth, Dr. Merchia's conduct during and around the time of the offenses is inconsistent with a suggestion that Dr. Merchia acted out of greed.  In or around 2014, Dr. Merchia hired external auditors to review Sleepheart's financial records.  The auditors identified insurance overpayments in the order of ~$300,000.  Although Dr. Merchia likely could have kept the money without anyone noticing, he chose to return the overpayments to the insurance companies without hesitation.  That Dr. Merchia did not act out of greed is also reflected in the fact that his primary home was, although located in a nice neighborhood, essentially in disrepair.  To this day, Dr. Merchia drives a 2009 Honda Odyssey minivan.  Thus, this is not a case where the defendant used fraud to fund an openly lavish lifestyle.

### III.     The Applicable Advisory Sentencing Guidelines Sentence

Probation has calculated the offense level as 25, which reflects a 2-point reduction for Dr. Merchia's "zero-point offender" status.  This corresponds to an advisory range of 57-71 months' imprisonment.  We understand that the government is seeking an additional 2-point obstruction of justice enhancement on each group.  We disagree that the enhancement should be applied.  If it is applied, however, we think it should be applied only to the tax offense group, as the tax offenses are the ones on which the government's obstruction arguments seem to focus.[3]

Notably, under the Sentencing Commission's most recent amendments to the § 2B1.1 fraud loss table—which are due to become effective on November 1, 2026—Dr. Merchia's offense level would drop to 24 (if the obstruction of justice enhancement were not applied) and top out at 26 (if the obstruction of justice enhancement were applied to both the healthcare and tax offense groups). We believe that, when sentencing Dr. Merchia, the Court should give salutary effect to the pending

---

[3] Applying an obstruction of justice enhancement only on the tax offense group would increase Dr. Merchia's offense level from 25 to 26.  This is because, without the enhancement, the tax offense group's offense level is a point lower than the healthcare offense group.

Guidelines amendments and effectively treat Dr. Merchia as though his offense level is 24 or 26 (depending upon application of the obstruction enhancement).[4]

### IV.    The Kinds of Sentences Available

Under the advisory Guidelines regime, the Court has an array of sentencing options available to it.  These include sentencing options that would serve a more valuable social function than a sentence of imprisonment.  For example, the Court could sentence Dr. Merchia to a sentence of probation with a combination of home confinement and community service requirements, such as requiring Dr. Merchia to provide pro bono medical care at shelters during the day and then restrict himself to his home at all other times.

### V.    The Need for Punishment and Deterrence

There is no doubt that healthcare fraud and tax evasion are serious offenses that need to be deterred.  A sentence substantially below the advisory Guidelines range, however, still would send a strong message of deterrence to would-be offenders.  Studies have shown that, in the context of white collar offenses, longer prison sentences do not necessarily provide a meaningfully greater general deterrence value than relatively short sentences.  *See, e.g.*, Wayne Henning, "Is Deterrence Relevant in Sentencing White-Collar Criminals?" 61 Wayne L. Rev. 27, 46-50 (2015).  One reason this is true is because what deters would-be white collar offenders most is not the risk of a long prison sentence, but the catastrophic collateral consequences that come along with getting caught.  A physician convicted of healthcare fraud, for example, typically loses his medical license entirely or has it suspended indefinitely and is excluded from participating in federal healthcare programs and private insurance networks.  That, more than a long prison sentence, is what deters.

---

[4] An offense level of 24 corresponds to an advisory range of 51-61 months' imprisonment.  An offense level of 26 corresponds to a range of 63-78 months' imprisonment.

With respect to specific deterrence, Dr. Merchia is not a risk of recidivism. He has no criminal history, and, because the loss of his medical licensure is likely a foregone conclusion, he is unlikely ever again to be in a position of trust vis-à-vis healthcare insurers or to generate enough income to make future tax evasion a meaningful temptation.

With respect to the need to punish Dr. Merchia for the sake of punishment, this case already has imposed substantial punishment on him. His professional reputation is in tatters, and the medical board is in the process of stripping him of his medical license. The stress of prosecution has broken him spiritually and imposed enormous stress on his family. His conduct also placed Dr. Shona Pendse, whom he loves deeply, in harm's way. This has exacerbated the stress this case has placed on Dr. Merchia's children, particularly his 10-year-old child. If a substantial prison sentence were imposed on Dr. Merchia, it would deprive his 10-year-old child of a father at just around the time that a child needs a father the most—the beginning of adolescence.

A substantial prison sentence would also make it more likely that Dr. Merchia will be unable to be with his parents during their final moments. Dr. Merchia's parents are in their 80s (his father is 87 years-old), and there is no guarantee that they will still be alive a few years from now.

Finally, the Court should consider that Dr. Merchia's medical condition will make any prison sentence more severe than it would be for an offender without any serious medical conditions. Dr. Merchia's medical condition will also put an additional strain on whatever correctional facility houses him, which militates in favor of a relatively shorter term of incarceration (if any).

**VI.    The Need to Avoid Unwarranted Sentencing Disparities**

To comply with § 3553(a)(6), a sentencing court must seek to avoid imposing on a defendant (i) a harsher sentence than similarly situated defendants have received, and (ii) the same or similar sentence as more culpable defendants have received. *See Gall v. United States*, 552 U.S. 38, 55 (2007); *United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010) (holding that, under *Gall*, a court must "guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct"). Section 3553(a)(6)'s plain language makes clear that the relevant point of comparison is the offender's underlying *conduct*, not the underlying charges or even the offender's Guidelines offense levels. *See* 18 U.S.C. § 3553(a)(6). In this regard, § 3553(a)(6) reflects Congress's recognition that a defendant's Guidelines offense level does not automatically reflect, and indeed can dramatically overstate, the actual nature or seriousness of the defendant's offense.

The need to avoid unwarranted sentencing disparities militates in favor of a sentence substantially below the bottom of the advisory Guidelines range. As shown by the sentencing data that Probation included at the conclusion of the Pre-Sentence Report, during the period 2021-2025, 47% percent of offenders similarly-situated to Dr. Merchia (*i.e.*, same offense level, similar offense category) received a downward departure from their advisory Guidelines range. During that time period, the average sentence length for all offenders similarly situated to Dr. Merchia was 43 months, while the median was 45 months. This implies that, for defendants who received downward departures, the mean downward departure was ~35% below the bottom of the advisory Guidelines range.

We think several comparator cases from this District demonstrate that any incarceratory sentence greater than 22 months' imprisonment would create unwarranted sentencing disparities.

9

In *United States v. Robinson*, No. 25-cr-10338 (D. Mass.), this Court sentenced the defendant, a physician, to 23 months' imprisonment for his involvement in a nationwide telehealth scheme that bilked insurers of more than $3.5 million, of which the defendant personally pocketed ~$2.7 million. Because the defendant received a 3-point reduction for acceptance of responsibility, his advisory Guidelines range was 46-57 months' imprisonment. This admittedly is higher than Dr. Merchia's advisory range. But, in terms of sheer dollar impact and his own personal gain, the defendant's crimes in *Robinson* were significantly more serious than Dr. Merchia's. We think a 22-month sentence for Dr. Merchia would be consistent with the sentence imposed on the defendant in *Robinson*. At the very least, we think Dr. Merchia should receive the same 50% discount on the bottom of his advisory range that the defendant in *Robinson* received.

Another comparator is *United States v. Oladipo*, No. 22-cr-10062 (D. Mass.), where the district court in 2024 sentenced Dr. Olarewaju Oladipo to 16 months' imprisonment, after a jury found him guilty of an opioid-related healthcare fraud scheme that stole ~$450,000 from insurance companies. Although Dr. Oladipo's fraud was less serious than Dr. Merchia's offense when measured by direct economic loss, it involved the overprescribing of opioids and, therefore, was significantly more serious from an overall perspective. Imposing a sentence of 22 months on Dr. Merchia would essentially treat him equivalently to Dr. Oladipo on the healthcare fraud offenses, while imposing an additional enhancement on Dr. Merchia for the tax offenses.

Another comparator case is *United States v. Ezeonyido*, No. 24-cr-10272 (D. Mass.), where the district court sentenced the defendant in 2025. In that case, the defendant was convicted of a years-long healthcare fraud scheme involving bogus billing of health insurance companies. The scheme resulted in a healthcare fraud loss to insurers of over $600,000, of which the defendant personally pocketed more than $300,000. What made the scheme particularly egregious was that

it involved fabricated medical records (including records fabricating patients' traumatic injuries) and fabricated bank records to support reimbursement requests. The scheme was a broad conspiracy involving multiple participants, all of whom acted at the direction of the defendant. The court sentenced him to 27 months' imprisonment.

A sentence of 22 months' imprisonment for Dr. Merchia would also be in line with sentences given to tax offenders with similar tax loss amounts. In *United States v. Hochberg*, No. 25-cr-10441 (D. Mass.), for example, the district court sentenced the defendant to 24 months' imprisonment for a decade-long tax evasion scheme that caused the state and federal tax authorities a tax loss of ~$835,000. The defendant also was a recidivist offender who, immediately prior to beginning his tax evasion scheme, completed a federal prison sentence for wire fraud. The defendant also engaged in obstruction of justice as part of his scheme. Despite all of this, the district court sentenced him to only 24 months' imprisonment.

## FINANCIAL PUNISHMENT

The Court is required to impose an order of restitution and forfeiture on Dr. Merchia. We are not contesting Probation's calculation of the restitution and forfeiture amounts, which are significant. Given the severity of the restitution and forfeiture orders that will be imposed on Dr. Merchia, and the likelihood that Dr. Merchia's conviction will make it extraordinarily difficult to earn meaningful income after he serves whatever prison sentence the Court imposes on him, we respectfully request that the Court not impose a fine on Dr. Merchia.

## CONCLUSION

For the foregoing reasons, we respectfully request that, if the Court chooses to impose an incarceratory sentence on Dr. Merchia, it be no greater than 22 months' imprisonment. We also respectfully request that the Court not impose any fine.

11

                                   Respectfully Submitted,

                                   /s/ Aaron M. Katz
                                   Aaron M. Katz
                                   Aaron Katz Law LLC
                                   399 Boylston St., 6th Floor
                                   Boston, MA 02116
                                   617-915-6305
                                   Akatz@Aaronkatzlaw.com


Dated: May 30, 2026

12

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 30, 2026, I electronically filed the foregoing document with the clerk of court by using the CM/ECF system which will send the notice of electronic filing to all attorneys of record.

*/s/ Aaron M. Katz*
Aaron M. Katz
