**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 22-cr-10355-NMG** |
| | ) | |
| | ) | |
| **PANKAJ MERCHIA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

The government respectfully submits that the court should sentence defendant PANKAJ

MERCHIA ("MERCHIA") to a term of incarceration 78 months (6.5 years); a fine of $25,000; a

period of supervised release of 2 years; restitution in the amount of $1,847,931.95, and a special

assessment of $700.  MERCHIA's crimes and conduct warrant a substantial period of

incarceration and criminal punishment.

**The U.S. Sentencing Guidelines**

A jury convicted MERCHIA on every count: Count 1 (Healthcare Fraud, 18 U.S.C.

§ 1347); Counts 2-4 (Unlawful Monetary Transactions, 18 U.S.C. § 1957); Count 5 (Conspiracy

to Defraud the IRS, 18 U.S.C. § 371); and Counts 6-7 (Tax Evasion, 26 U.S.C. § 7201). As in

most fraud and financial crime cases, the amount of loss under U.S.S.G. § 2B1.1 determines the

base offense level and drives the ultimate sentence.[1]

---

[1]While the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.") are advisory and not mandatory, *United States v. Booker*, 543 U.S. 220 (2005), the First Circuit has made clear that "the guidelines still play an important role in the sentencing procedure, so that [ ] a court should ordinarily begin by calculating the applicable guideline range." *United States v. Gilman*, 478 F.3d 440, 445 (1st Cir. 2007).  A properly calculated guideline range is the starting point for most sentences imposed under the advisory sentencing guidelines and anchors the court's discretion in selecting the appropriate sentence.  *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016); *United States v. Patch*, 9 F.4th 43, 48 (1st Cir. 2021).

A. The Healthcare Fraud and Money Laundering Offenses

1. *Amount of Loss – 2B1.1 (Level 20)*

The amount of loss for the healthcare fraud (Count 1) and unlawful monetary transactions (Counts 2-4) convictions [Group 1] under USSG §§ 2B1.1 and 2S1.1 is squarely between $500,000 and $1.5 million, resulting in offense level 20. *See* USSG § 2B1.1(b)(1)(H). It is well-settled that the government's burden of proof is a preponderance, and the court has "considerable discretion" in making a "reasonable estimate." *United States v. Robertson*, 162 F.4th 209, 246 (1st Cir. 2025).

Here, the guideline loss amount is conversative and unassailable.  To begin, the government's guideline loss amount only looks at the seven patients who testified at trial, even though the evidence also showed that MERCHIA received millions more from very similar claims. Further, instead of seeking to hold MERCHIA accountable for his massive intended loss for these seven patients, more than $7 million, the amount of loss is simply total amount of funds that MERCHIA unlawfully obtained from Cigna Healthcare, United Health Care (UHC)/OPTUM, and Harvard Pilgram Health Care ("HPHC")/Point32 Health, a total of $742,405.95.  This chart summarizes these numbers:

| Patient | Intended Loss | Actual Loss |
|---|---|---|
| "SA" (Patient 1) | $274,122.28 | $94,707.78 |
| "KC" (Patient 2) | $591,616.78 | $91,350.57 |
| "PC" | $3,221,166.59 | $0.00 |
| "LR" | $720,335.66 | $112,231.70 |
| "NA" | $522,378.36 | $54,007.71 |
| "JM" | $2,214.98 | $0.00 |
| "VM" | $1,820,605.45 | $390,108.19 |
| TOTALS | $7,152,440.10 | $742,405.95 |

2. *Sophisticated Means - 2B1.1(10)(C) (+2 Levels)*

To execute his fraud and laundering offenses, MERCHIA used a dizzying amount of shell

2

companies and limited liability companies in Virginia, Maryland, and Minnesota to defraud healthcare insurers and conceal millions of dollars in real estate. *See* USSG § 2B1.1(b)(10)(C), comment. (no. 9(B)) ("Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means"); *see also United States v. Ponzo*, 171 F.4th 507, 513 (1st Cir. 2026) (describing the examples in application note 9(B) as "just an example", and not an exhaustive list). MERCHIA used these companies, and his significant other and co-conspirator, to create a fiction that he was not the owner or the responsible party.  MERCHIA also used his computer prowess to electronically spam bill insurance companies to overwhelm their systems and get paid. Based on these facts presented at trial, the 2-level enhancement clearly applies.

3. *Laundering Offense - 2S1.1(b)(2)(A) (+1 Level)*

Under USSG § 2S1.1(b)(2)(A), since the defendant was convicted of two counts of 18 U.S.C. § 1957, there is an automatic one-level increase for those convictions.

4. *Abuse of Position of Trust – 3B1.3 (+2 Levels)*

The PSR correctly found that as a Harvard educated and licensed physician, MERCHIA used "his position of private trust and special skills as a licensed physician to facilitate his commission and concealment of the instant offense."  PSR ¶ 110.  The core menace of MERCHA's scheme was to abuse his position of trust with his patients' information to repeatedly and fraudulently bill healthcare insurers. *See e.g., United States v. Bertram*, 900 F.3d 743, 753 (6th Cir. 2018) ("Health care providers occupy a position of trust with respect to private insurance companies if they enjoy professional discretion over whether to conduct testing and submit bills").

There is also no doubt that MERCHIA possessed special skills and professional discretion as a physician, and that he used those skills – including his knowledge of healthcare billing,

3

patient diagnosis, and the healthcare system in general - to facilitate his crimes. *See e.g., United States v. Yoon*, 167 F.4th 556, 568 (1st Cir. 2026) ("[defendant], like other health care professionals, exercised significant discretion to determine what types of treatments were necessary and appropriate for his patients . . . [and] insurance companies must rely on medical professionals' good faith in using this discretion when they submit claims because insurers are swamped with reimbursement requests and thus cannot review each claim individually") (internal citations quotations omitted).

The two-level enhancement is clearly warranted, resulting in adjusted offense level 25.

5. *Obstruction of Justice – 3C1.1 (+2 levels)*

The Final PSR did not apply an obstruction of justice enhancement and noted that with regards to MERCHIA's trial testimony as a basis for obstruction that "the Court presided over the trial, the Probation Office respectfully defers to the Court for a determination." PSR ¶ 111, fn 15. The court should find by a preponderance that MERCHIA willfully attempted to obstruct and impede the administration of justice with respect to the government's investigation and prosecution. *See* U.S.S.G. § 3C1.1; *United States v. Barker*, 80 F.4th 827, 835 (7th Cir. 2023) ("To impose this enhancement, it is enough that the defendant attempted to engage in obstructive conduct, regardless of whether that attempt was ultimately successful").[2]

First, even though he testified in a narrative format, MERCHIA committed perjury on the witness stand. *See* USSG § 3C1.1, comment. (n. 4(B) ("committing, suborning, or attempting to suborn perjury"). For example, MERCHIA maintained that the money used for the purchase of the Brookline residence came from SHONA PENDSE's business (SleepHeart) and PENDSE's parents. See Trial Transcript Day 9 (Morning) pg. 24. MERCHIA insisted it was not his money.

---

[2] The conduct warranting a 2-level obstruction of adjustment enhancement pertains to MERCHIA's conduct as the defendant, and not his own counsel.

The trial evidence, however, established SleepHeart was in fact MERCHIA's business, and that about $1.2 million was from MERCHIA's healthcare fraud.  See Trial Ex. 66-C and 69-B.  In fact, throughout his testimony, MERCHIA falsely claimed that he had sold SleepHeart to PENDSE – the mother of his children whom he married but was no longer his wife – for $30 million.  See Trial Tr. Day 9 (Afternoon) pg. 27.  This was not simply a denial of guilt, negligent mistake, or the product of faulty memory.  See USSG § 3C1.1, comment. (n. 2.).  MERCHIA's statements were intentional lies that he perpetuated during civil litigation and the trial that led to his conviction.

Second, MERCHIA produced false and counterfeit documents during his litigation with IRS in U.S. District Court and Tax Court, as well as during this trial.  *See* USSG § 3C1.1, comment. (n. 4(C) ("producing or attempting to produce a false, altered, or counterfeit document or records during an official investigation or judicial proceeding").  These documents included the "Memorialization of Sale Agreement between Pankaj Merchia and SleepHeart of Virgina LLC" (Trial Ex. 108) that MERCHIA provided to the IRS during its audit, and the 2008 Sales Agreement that MERCHIA falsely claimed in an affidavit that he had found in 2020.  Trial Ex. 131-A-B.

Third, when questioned by the investigators in this case about his relationship to CPAP Clinical and Concierge in October 2021, MERCHIA said he did not own either company and falsely claimed that he could not disclose the true owners of the companies because of a non-disclosure order.  Trial Tr. Day 6 (Afternoon) pg. 33.  What is more, after being served with a grand jury subpoena for records related to these and other companies including SleepHeart, MERCHIA falsely claimed that these records were lost from a computer virus but then proceeded to access the records from his computer at counsel table during the trial.

Finally, MERCHIA engaged in obstructive conduct when he frivolously sued two of his

former patients, Sheila Aref and Kristen Chubbuck, once he learned through discovery they might testify against him. *See Merchia v. Aref,* 24-cv-2701 (D.D.C.); *Merchia v. Chubbuck*, 23-cv-3918 (D.D.C.). This attempt to intimidate and silence witnesses is itself a sufficient ground for finding an obstruction enhancement.

The conduct warranting a 2-level obstruction of adjustment enhancement pertains to MERCHIA's conduct as the defendant, and not his own counsel. With this enhancement, the resulting offense level for the money laundering and health care fraud counts is 27.

B. The Tax Offenses

1. *Tax Loss – 2T4.1 (Level 20)*

As reflected in the PSR, MERCHIA was convicted of two substantive counts of tax evasion (for the tax years 2017 and 2019) as well as with a conspiracy to defraud the IRS involving total of $11,471,120 in unreported gross receipts. PSR ¶ 113. After deducting expenses, the total amount of unreported income was $6,612,039, resulting in a total tax loss of $1,105,526, even after accounting for a $2.25 million payment to the IRS in 2013. *See* Trial Ex. 135-142. The result under the tax loss table is base offense level 20. *See* USSG §§ 2T1.1(a)(1), 2T4.1(H).

2. *Specific Offense Characteristics – 2T1.1 (Level 24)*

The PSR determined that two specific offense characteristics apply. First, because the income from defendant's health care fraud offenses in 2017 and 2019 exceeded $10,000 – including the money that MERCHIA laundered in Counts 2 through 5 – there is an automatic 2 level increase under USSG § 2T1.1(b)(1). Second, similar to the means to execute the healthcare fraud offense, the PSR fount that MERCHIA's tax offenses involved "sophisticated means" under USSG § 2T1.1(b)(2). *See* USSG § 2T1.1 comment. (n. 5) (defining "sophisticated means" in the same way as application note 9(B) of § 2B1.1). Here, the 2-level enhancement should apply

because of MERCHIA's extensive use of shell companies and fake documents to conceal his taxable income from the IRS. For example, at trial IRS Revenue Officer Stephen Crimmins testified that MERCHIA had apparent ownership in 25 different entities when he attempted to collect taxes owed in 2013. Trial Tr. Day 6 (Morning) pp. 105, 111.  Further trial evidence showed MERCHIA creating yet more shell companies and nominee entities after 2013 as well.

Finally, MERCHIA obstructed justice with respect to his tax crimes, as he did for the money laundering and health care fraud offenses.  He did so by misleading investigators and testifying falsely.  Therefore, the adjusted offense level for the tax counts is 26.

C.  Total Offense Level

The grouping of both the healthcare fraud/money laundering and tax offenses results in an addition of 2-levels to the highest offense level of the two groups.  *See* USSG § 3D1.4(a).  While the PSR found that the highest offense level was 25, the government submits that the highest offense level should be 27 (with an obstruction of justice enhancement), resulting in offense level 29.  After a 2-level Zero-Point Offender reduction under USSG § 4C1.1, the total offense level should be 27, with an advisory sentencing guideline range of 70-87 months.  (The PSR's final sentencing guideline range is 57-71 months).

As further described below, the government submits that the court should impose a sentence of 78 months (6.5 years) of incarceration; a fine of $25,000; a period of supervised release of 2 years; restitution in the amount of $1,847,931.95, and a special assessment of $700.

**The Government's Sentencing Recommendation**

A sentence of incarceration of 78 months, which is within the advisory sentencing guidelines, is necessary to further the goals of sentencing under 18 U.S.C. § 3553(a).  A fine of $25,000, below the applicable guideline fine range, is also appropriate since the defendant has not shown an inability to pay a fine.

A. "The nature and circumstances of the offense"

MERCHIA's schemes—and the manner in which he carried them out—were extraordinary in both scope and execution. First, his fraudulent conduct spanned more than a decade. MERCHIA began seeking to the defraud the IRS with the bogus sale of SleepHeart to PENDSE as far back as January 2013, when he filed a false return first purporting to show that the sale had taken place. *See* PSR ¶ 69. The trial evidence showed that MERCHIA maintained that fraudulent narrative for years: from 2013 through 2019 he continuously filed false tax returns claiming millions in refunds, he lied to IRS revenue officers and agents such as Stephen Crimmins and Mia Alonzo, he sued the IRS in Tax Court and federal District Court, all while purporting the same false premise of his conviction; that he sold SleepHeart to PENDSE for $30 million. *See* PSR ¶¶ 69-86. Remarkably, MERCHIA's spurious litigation has continued even after his conviction at trial. *See* ECF 71 (Government's Motion to Revoke Conditions).

Second, while the illicit gain for which MERCHIA is held accountable under the Sentencing Guidelines is modest and conversative, the amount of money for which MERCHIA fraudulently billed was massive. As indicated in the PSR, between 2017 and 2019 MERCHIA billed healthcare insurers more than $277 million for claims essentially the same as those proven to be fraudulent at trial. *See* PSR ¶¶ 49-50. For these claims he was paid over $2 million from Cigna and United Healthcare alone. *See id.* MERCHIA purposely overwhelmed healthcare insurers to get more and more money.

One glaring example was the bills MERCHIA submitted for his brother, the basis for his healthcare fraud conviction on Count One. The evidence at trial showed that MERCHIA had been warned by Harvard Pilgrim that he could not submit claims for his brother, which he had done using an entity named CPAP Clinical Services. Rather than stop, MERCHIA created a new entity named CPAP Concierge. Within a month - between December 31, 2017 and February 1,

8

2018 - MERCHIA used CPAP Concierge to bill Havard Pilgrim more than $1.8 million, for one patient, and one CPAP machine. *See* Exhibit 8-C. As evidenced at trial (e.g., from the testimony of Brian Robinson at Point32 and Michael Goldfarb from CIGNA) healthcare insurers had to devote a significant amount of time and resources to manage and respond to MERCHIA's fraudulent schemes and machinations.

Further, the nature and circumstances of the health care offenses are notable for how MERCHIA persisted in his frauds despite numerous opportunities to stop. When the insurers got wise and began denying claims, or told him he was not permitted to submit the claims, or even when they told him what he was doing was fraud – *see, e.g,* Exhibit 31 at 5 – MERCHIA kept going by submitting new bills and changing the name of the entity he was billing under.

MERCHIA's tax crimes were also significant in the same way, in money, scope, and persistence. Over a ten-year period, MERCHIA failed to report more than $6.6 million in taxable income, thereby avoiding the obligation to pay the IRS more than $1.1 million in taxes (even after accounting for MERCHIA's 2014 $2.2 million payment to the IRS). *See* Exhibit 138. Not only did MERCHIA fail to report and pay income taxes, but he also intentionally and repeatedly lied to the IRS (e.g., testimony of Stephen Crimmins and Mia Alonzo from the IRS) and engaged in spurious litigation with the IRS (e.g., testimony of Deborah Aloof) to reclaim money premised on his central lie: that he sold his SleepHeart business to PENDSE for $30 million.

Third, while MERCHIA's individual patients did not suffer any great financial losses from his conduct, many were nonetheless harmed by MERCHIA's greed. Patients who had not seen or received any care from MERCHIA in years unexpectedly received stacks of EOB's (Explanation of Benefits) from their insurance companies. Without any answers from MERCHIA, many of his patients spent long periods of time on the phone with their insurance companies to understand why they were receiving statements from a doctor they had not seen in

years.  Joy Thomas testified that when she worked for MERCHIA, she fielded numerous calls and emails from angry former patients who were upset about MERCHIA's billing practices and its effect on them.  *See* Trial Tr. Day 3 pgs. 94-96.  Not only did MERCHIA fail to take care of his patients, and used them for his fraudulent billing, following his indictment, MERCHIA took it one step further.  He filed frivolous lawsuits against two of his patients for defamation in U.S. District Court in Washington, D.C. *See Merchia v. Aref,* 24-cv-2701 (D.D.C.); *Merchia v. Chubbuck*, 23-cv-3918 (D.D.C.).  The cases were dismissed, but not without further stress and headaches from being sued by their sleep apnea doctor.

B.  "[T]he history and characteristics of the defendant"

There is nothing in MERCHIA's background that can explain or mitigate his conduct.  On the contrary, MERCHIA's personal background and characteristics demonstrate that he was and could have been a very successful physician and entrepreneur – he could have easily paid taxes on his income and kept up a very high standard of living, and he could have earned a sizable salary working honestly as a physician.  Instead, MERCHIA's history and characteristics fueled his elevated sense of ego and led him to steal out of narcissism and greed.  MERCHIA acted as if the laws and the rules that governed his conduct as a physician, taxpayer, and citizen did not apply to him because he was too smart and too clever to get caught.

The manner in which MERCHIA executed his crimes and then sought to avoid responsibility was equally appalling.  He chose, time and again, to put his own interests in furthering his various frauds despite their impact on others.  Although he somehow denies the nature of the relationship, MERCHIA used his spouse and the mother of his children to avoid his tax liability to suggest that the person in charge of SleepHeart and his various companies was PENDSE, and not him.  Furthermore, while MERCHIA's was certainly permitted to represent himself in court and defend his case, the fact that MERCHIA was seeking to have his own

children testify in court about the nature of his relationship with their mother speaks to MERCHIA's psyche.

C. "[The need for the sentence imposed to . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"

A sentence of incarceration of 78 months reflects the seriousness of MERCHIA's healthcare fraud, money laundering, and tax evasion offenses. While within the advisory sentencing guideline range, in several ways, the U.S. Sentencing Guidelines understate the severity of MERCHIA's conduct.

First, as described above, despite the large amounts that he fraudulently billed, MERCHIA is only being held responsible for the illicit gain proven at trial from the limited selection of patients who testified. Between 2017 and 2019, to two insurance companies alone, MERCHIA submitted over 37,000 claims for at least 310 patients. *See* PSR ¶¶ 49-50. Seven of these patients testified at trial. And while it is true that MERCHIA's healthcare fraud offense did involve a single large payment of $390,108, the scope of MERCHIA's conduct was more than one bill. *See United States v. Rivera-Ortiz*, 14 F.4th 91, 104 (1st Cir. 2021) (in calculating loss amounts under the Guidelines, a district court evaluates losses stemming from the conduct of conviction and any relevant conduct including conduct that was "part of the same course of conduct or common scheme or plan as the offense of conviction") (quoting U.S.S.G. § 1B1.3(a)(2)). For this reason, comparisons to simple, straightforward tax or healthcare cases are much less persuasive. MERCHIA's crime and relevant conduct truly stands on its own.

Second, there is MERCHIA's primary role in the offense. While the government maintains that SHONA PENDSE was an active and culpable participant in the conspiracy to defraud the IRS, and was acting on the behest of her husband, the evidence at trial also made clear that MERCHIA was the driving force behind the scheme. MERCHIA made PENDSE, also

11

a highly educated and successful physician, into a co-conspirator in a fraud scheme driven by MERCHIA's greed and narcissism. MERCHIA also enlisted the unknowing participation of others, including a woman he hired as his nanny (Joy Thomas) and a man he hired as a carpenter (Iiro Maki) to help him execute his frauds.

Importantly, the scope of MERCHIA's conduct went beyond submitting fraudulent healthcare bills but included a conspiracy to defraud the IRS out of millions of dollars, and to use the proceeds of his healthcare offenses to purchase a $2 million residence in Brookline, Massachusetts. And despite the fact that he is the true owner of three multi-million-dollar homes in Florida, Virginia, and Massachusetts (*see* Exhibit 65-E), MERCHIA has nonetheless insisted that he is indigent requiring the court to appoint CJA counsel. Tellingly, even though his sleep medicine practice grossed more than $11.7 million over 10 years, MERCHIA has claimed to U.S. Probation that he has not earned a salary since 2009 and has failed to submit any type of financial statement regarding his ability to pay a fine. *See* PSR ¶¶ 153, 158.

Further, it is clear that MERCHIA does not respect the law. He lied without compunction, to the IRS, to federal agents, and in court. Time and again he committed perjury and submitted false and fabricated documents. MERCHIA sees the law not as a limit on his behavior, but as something to be outmaneuvered, an impediment to his own wealth. He also sees the law as a tool for harassment: in an attempt to silence the government's witnesses, MERCHIA sued the two patients mentioned in the indictment as soon as he received discovery. He nearly succeeded in preventing these witnesses from testifying, for fear of further harassment and expense. He also frivolously sued Special Agent Charles Shevlin, Investigator Kevin Richard, Harvard Pilgrim, and United Healthcare, among others.[3]

---

3 *Merchia v. Aref*, 24-cv-2701 (D.D.C); *Merchia v. Chubbuck*, 23-cv-3918 (D.D.C.); *Merchia v. Harvard Pilgrim Healthcare, Inc.*, 23-cv-3913 (D.D.C.); *Merchia v. Richard*, 23-cv-3914 (D.D.C.); *Merchia v. Shevlin*, 23-cv-3915 (D.D.C.); *Merchia v. United Healthcare Services, Inc.*, 24-cv-2700. These are a small number among many of

Thus, a sentence of incarceration of 78 months, a presumptively reasonable sentence within the advisory range maintained by the government, accounts for the amount of financial loss, MERCHIA's sophistication and abuse of his position of trust as a physician as well as his prolific obstruction of justice.

D. "[T]he need for the sentence imposed to afford adequate deterrence to criminal conduct; [AND] to protect the public from further crimes of the defendant."

The sentence imposed must afford adequate general deterrence.  Our tax and healthcare systems rely on the honesty of taxpayers and physicians.  Given the large number of tax returns and health insurance claims, the IRS and insurance companies must rely on a voluntary reporting system that depends on the honesty of the submitter.  Either system would fall apart if taxpayers or providers routinely lied the same way that MERCHIA did.  A significant sentence would demonstrate to other would-be criminals that there are consequences for cheating on their taxes and defrauding heath insurers.  And it would show honest taxpayers and health care providers that they are not abiding by the law in vain.

The sentence must also afford specific deterrence, to protect the public from further crimes.  To varying degrees, the criminal justice process often leads defendants to confront the reality of their actions and the harm those actions have caused.  In most white-collar and economic crime prosecutions, even after trial, a defendant usually exhibits some tacit recognition of their conduct and modifies their conduct.

Not PANKAJ MERCHIA. There is nothing in the record at trial or the PSR that suggests, in any way, that this defendant has recognized anything he has done wrong.  Instead, MERCHIA views himself as a victim, and places the blame for his situation on others.

For this reason, while a sentence of incarceration is important to general deterrence, here

---

MERCHIA's various lawsuits.

there is a genuine issue of specific deterrence, for both his healthcare and tax offenses.  As former FBI Special Agent Joseph Parker and MERCHIA himself testified at trial, MERCHIA was the target of an FBI investigation into healthcare fraud which he was aware of from at least 2013.  Agent Parker even warned MERCHIA about unlawful billing for family members.  Most doctors who were targets of an investigation that did not end in charges might have taken great care to bill honestly going forward.  Instead, MERCHIA learned the lesson that he could get away with it and chose instead to supercharge his attempts to defraud insurance companies.

Similarly, neither his indictment nor *conviction* for his tax frauds have slowed MERCHIA's attempts to defraud the IRS.  In his own name and through PENDSE, he continued to file false tax returns claiming large refunds from the IRS based on the same false story about having sold SleepHeart and is suing the agency in order to get those refunds.  MERCHIA cannot be deterred from defrauding the IRS even when in the midst of his criminal prosecution for doing the same.  MERCHIA was not deterred even though he knew the government and Court were watching.  For this reason, a sufficiently lengthy period of incarceration is necessary to end this years-long cycle of unmitigated fraud, and impress on MERCHIA that he must stop stealing.

14

Conclusion

Accordingly, based on the foregoing, the government submits that the court should impose a sentence of 78 months (6.5 years) of incarceration; a fine of $25,000; a period of supervised release of 2 years; restitution in the amount of $1,847,931.95, and a special assessment of $700.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    /s/  Neil Gallagher
        Neil J. Gallagher, Jr.
        Assistant U.S. Attorney
        Ezra Spiro
        Trial Attorney

Date Submitted: May 31, 2026

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By:    Neil Gallagher
        Neil J. Gallagher, Jr.
        Assistant U.S. Attorney